UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 99-4013

RAY WALLACE METTETAL, JR., a/k/a
Steven Ray Maupin,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
James H. Michael, Jr., Senior District Judge.
(CR-96-34)

Argued: December 3, 1999

Decided: May 3, 2000

Before WILKINS and MICHAEL, Circuit Judges, and
Margaret B. SEYMOUR, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Vacated by unpublished per curiam opinion. Judge Michael wrote the
opinion, in which Judge Wilkins and Judge Seymour joined.

_____

**COUNSEL**

**ARGUED:** Frederick Theodore Heblich, Jr., PARKER, MCELWAIN
& JACOBS, P.C., Charlottesville, Virginia, for Appellant. Ray B.
Fitzgerald, Jr., Assistant United States Attorney, Charlottesville, Vir-
ginia, for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States
Attorney, Charlottesville, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

MICHAEL, Circuit Judge:

Ray Wallace Mettetal, Jr. appeals his convictions for possession of a toxin in violation in 18 U.S.C. § 175 and for possession of false identification documents in violation of 18 U.S.C.§ 1028(a)(3). Because the police lacked probable cause to arrest Mettetal and the evidence used to convict him was the fruit of that unlawful arrest, we vacate his convictions.

I.

Mettetal was arrested while walking along a sidewalk on the campus of Vanderbilt University on August 22, 1995. It appears that Mettetal's presence on the campus that day had something to do with a man against whom he held a longstanding grudge. That man was Dr. George Allen, Chairman of the Neurosurgery Department at the Vanderbilt University Medical Center. Almost a dozen years earlier, Mettetal, who is a physician, started a residency in neurosurgery at Vanderbilt under the direction of Dr. Allen. When Dr. Allen suggested that Mettetal's progress at the end of his first year was not quite up to par, Mettetal abruptly resigned from the program. Although Mettetal eventually finished a residency in neurology at Vanderbilt, he blamed Dr. Allen for denying him a career as a neurosurgeon. For years Mettetal kept track of Dr. Allen's whereabouts and activities, and it could be inferred that Mettetal was making plans to exact revenge. However, when the Vanderbilt campus police arrested Mettetal, they knew nothing of his grudge against Dr. Allen. Instead, what they knew about Mettetal was gleaned from a complaint and a forty-minute encounter with him.

At around 9:50 a.m. on August 22, 1995, Christy Wilson, a medical center employee, saw Mettetal on the second floor of the institution's parking garage. Wilson became suspicious because Mettetal was

2

"looking around at cars" and was wearing a fake beard, a wig, and a dark suit on what was a hot, 90-degree morning. Wilson called the Vanderbilt campus police, and Sergeant James Campbell, Officer Jennifer West, and several other officers responded. The officers were advised by the dispatcher that "there was a male subject wearing a beard and he had been going through the garage parking lot." Officer West was instructed to go to the scene (the second floor of the garage), and Sergeant Campbell drove around the outside of the garage in his patrol car. As Officer West neared the garage, Sergeant Campbell radioed, saying that he was already talking with the man on Garland Avenue, a street that fronted the garage.

Sergeant Campbell had spotted Mettetal from his patrol car at about 10:00 a.m. Campbell noticed that Mettetal "had a dark wig on, a beard, and he was wearing a three piece suit" and carrying a black nylon bag. (Another officer said that Mettetal, who is white, "had an obvious fake Afro wig and a fake beard that looked like Abraham Lincoln.") Sergeant Campbell stopped his car a few feet behind Mettetal, got out, and called for Mettetal to stop. Mettetal complied. Campbell then instructed Mettetal to put down his bag, and asked Mettetal "his business." Mettetal put down his bag and responded to Campbell's question by saying that "he had a girlfriend that he was trying to -- he [thought] she was seeing someone else and he was watching her." After accusing Mettetal of stalking, the officer asked him the woman's name. Mettetal replied that he would rather not give her name.

At about this time Officer West and several other officers arrived and positioned themselves around Mettetal. Sergeant Campbell and at least one other officer continued to question Mettetal, who repeatedly declined to provide any information. Mettetal did ask to speak with a lawyer, but this request was ignored. When Campbell asked Mettetal for identification, Mettetal at first said he had none. Campbell continued to press Mettetal for identification, finally saying, "sir, if you can't produce any identification, I'm going to have to take you down for trespassing." At that point, Mettetal gave Sergeant Campbell "British West Indies" identification ("ID") in the name of Steven Ray Maupin. The officers suspected that the ID was a fake. This suspicion was based on the fact that the ID's covering had rough edges, indicating that it had been laminated quite recently. For about the next thirty

3

minutes the officers had their dispatcher run computer checks on the name Steven Ray Maupin. In the meantime, Mettetal was perspiring heavily in the hot sun, and his fake beard and moustache had begun to peel off. Still, he was calm and polite throughout the encounter.

After the computer checks produced no information, Mettetal was arrested for criminal trespass. Mettetal was on Vanderbilt University property when he was first spotted and later stopped and arrested. Vanderbilt is a private university, but its campus, including Garland Avenue (where Mettetal was stopped), is open to the public. The area around Garland Avenue includes many of the school's medical facilities, and people who are not students or staff come and go freely through this area of the campus. The University makes an effort to make the public feel welcome on its campus, although there are some perimeter signs saying that visitors are "subject to a security check." The vehicle entrance to the garage where Mettetal was first spotted is marked with a sign that reads, "Caution, Autos Only, No Motorcycles, Bicycles or Pedestrians." The second floor of the parking garage, where Wilson saw Mettetal, is reserved (by sign) for medical school faculty and staff parking. Pedestrians are not barred from the garage, however. A street entrance to the garage is marked with a large sign that says "Pedestrian Entrance."

After Mettetal was placed under arrest, his bag and person were searched. In the bag, the police found, among other things, sketches and information about an automobile, fake tattoos, and a large hypodermic syringe filled with a clear liquid.[1] On him, they found more identification in the name of Steven Ray Maupin. Once Mettetal was taken into custody, he refused to answer questions or to disclose his true identity. The next day, the Nashville police learned from the FBI that he was Ray Wallace Mettetal, Jr., a medical doctor from Harrisonburg, Virginia.

On August 25, 1995, three days after Mettetal's arrest, Virginia police obtained warrants to search his home and office. The information used to support these warrants came directly from the circumstances surrounding Mettetal's arrest, the search incident to his arrest, and discussions with his children and former wife. (The police

_____

[1] The liquid was later determined to be a saline solution.

4

learned from Mettetal's family that he hated Dr. Allen and that he owned several high-powered firearms.) The search of Mettetal's office produced nothing of consequence. But in Mettetal's home the police found bogus identification documents in the name of Steven Ray Maupin, fake hair, moustaches, makeup, a hospital uniform from the Vanderbilt medical center, and a book on disguise techniques that contained notes describing the home, cars, and personal history of Dr. Allen. The Maupin identification materials had Mettetal's photo on them.

Within a day or two of Mettetal's arrest, a story about it (and his use of the Maupin alias) appeared in a local Virginia newspaper. An employee at a Harrisonburg mini-storage unit facility saw the story and reported to the police that he had rented a unit in December 1994 to someone purporting to be Steven Ray Maupin. Using the information discovered as a result of Mettetal's arrest, including that gleaned from the search of his home, the police obtained a warrant for the search of the storage unit.[2] The search of the unit turned up a large jar of ricin, a deadly toxin.

Mettetal was indicted on two counts in the Western District of Virginia. Count I charged him with possession of a toxin (ricin) for use as a weapon, in violation of 18 U.S.C. § 175; Count II charged him with possession with intent to use unlawfully five or more false identification documents (that is, the documents found in the search of his home or the storage unit), in violation of 18 U.S.C.§ 1028(a)(3).

Mettetal moved to suppress the evidence against him, including the false identification found at his home (or in the storage unit) and the ricin found in the storage unit, on the ground that it was all gathered as the fruit of his unlawful arrest in Nashville. The district court held a suppression hearing and considered the evidence (recounted above) about the events leading up to Mettetal's arrest on a public street at

_____

**2** In each one of the three search warrant applications submitted in Virginia, the officer's affidavit placed special emphasis on the large hypodermic needle found during the search incident to Mettetal's arrest in Tennessee. The officer said, among other things, that the "syringe [could be] a deadly weapon in the hands of a trained medical doctor such as Mettetal."

the Vanderbilt campus. The court emphasized the following facts: that the police received a report "to the effect that there was a suspicious character" in the parking garage; that the man was wearing an Afro wig and a false beard and moustache; that he refused to cooperate; that he gave the police an identification they suspected was false; and that he was trying to check on a female friend. From this, the district court concluded that the Vanderbilt campus police had probable cause to arrest Mettetal for any one of three Tennessee crimes: criminal trespass, stalking, or violation of the Tennessee mask statute (civil rights intimidation). Because the court concluded that the arrest was lawful, the motion to suppress was denied.

Mettetal's main defense at trial was that he lacked criminal intent. He contended that he did not intend to use the ricin as a weapon, nor did he intend to use the false identification cards for unlawful purposes. In support of this defense, Mettetal offered a psychiatrist as an expert. The psychiatrist testified that Mettetal was suffering from a mental disease -- an adjustment disorder with depressive mood.[3] Mettetal was convicted on the federal charges and sentenced to ten years in prison.

Mettetal was also indicted in Tennessee for attempted murder. The trial court there, however, concluded that there was no probable cause for his arrest by the Vanderbilt campus police. As a result, it suppressed all evidence seized in the search incident to his arrest and further suppressed all evidence seized as a result of the search warrants issued in Virginia. See Tennessee v. Mettetal, No. 95-D-2507 (5th Cir., Davidson County, Tenn. Oct. 8, 1999).

Mettetal appeals his federal convictions on several grounds. His first argument is that the district court erred in denying his suppression motion, a ruling that was based on the court's conclusion that Mettetal's warrantless arrest was legal.

_____

[3] Mettetal argues that the district court erred in not allowing his expert to testify fully about Mettetal's symptoms or about the disorder's effects on his behavior.

6

II.

We turn to the question whether the Vanderbilt campus police had probable cause to arrest Mettetal. The facts and circumstances surrounding the telephone complaint about Mettetal's presence in the parking garage and about his stop and subsequent arrest are undisputed. The specific question for us is whether these undisputed facts and circumstances gave rise, as a matter of law, to probable cause. Our review is de novo. See Ornelas v. United States, 517 U.S. 690, 696-99 (1996).

The Supreme Court reaffirmed the classic definition of probable cause in Brinegar v. United States, 338 U.S. 160, 175-76 (1949):

> The substance of all of the definitions of probable cause is a reasonable ground for belief of guilt. And this means less than evidence which would justify condemnation or conviction . . ., [but] it has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

(Citations and quotation marks omitted; third and fourth alterations in original.) The Supreme Court emphasized that "[i]n dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar, 338 U.S. at 175. Any other approach, the Court said, "would unduly hamper law enforcement." Id. at 176.

With Brinegar's standard and its note of caution in mind, we turn to whether the undisputed facts and circumstances known to the Vanderbilt campus police gave them probable cause to arrest Mettetal for criminal trespass, stalking, or violation of the Tennessee mask statute. As we will explain, probable cause was lacking.

7

A.

Mettetal was arrested for criminal trespass on the Vanderbilt campus. A person commits criminal trespass in Tennessee when he enters or remains on property (or a portion thereof), knowing that he "does not have the owner's effective consent" to be there. Tenn. Code Ann. § 39-14-405(a) (1997). Knowledge that the owner's consent is lacking "may be inferred" when there is (1) "[p]ersonal communication to the person" that he should not enter or remain on the property, (2) "[f]encing or other enclosure obviously designed to exclude intruders," or (3) "[p]osting reasonably likely to come to the attention of intruders." Id. § 39-14-405(a)(1)-(3).**4**

Mettetal was not verbally warned or advised by anyone to stay off

_____

**4** The Tennessee criminal trespass statute provides:

> 39-14-405. Criminal trespass.--(a) A person commits criminal trespass who, knowing the person does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof. Knowledge that the person did not have the owner's effective consent may be inferred where notice against entering or remaining is given by:
>
> (1) Personal communication to the person by the owner or by someone with apparent authority to act for the owner;
>
> (2) Fencing or other enclosure obviously designed to exclude intruders; or
>
> (3) Posting reasonably likely to come to the attention of intruders.
>
> (b) It is a defense to prosecution under this section that:
>
> (1) the property was open to the public when the person entered and remained;
>
> (2) The person's conduct did not substantially interfere with the owner's use of the property; and
>
> (3) The person immediately left the premises upon request.
>
> (c) For purposes of this section, "enter" means intrusion of the entire body.
>
> . . . .

Vanderbilt property. Nor was the campus fenced or otherwise enclosed. The only question is whether there were adequate signs posted to warn Mettetal that he would be a trespasser if he entered. The facts and circumstances reveal that the campus was not posted against trespassing. In fact, the opposite was the case: the campus was open to the public. There were some perimeter signs warning visitors that they were "subject to a security check." These signs, however, did not warn potential visitors to keep out. The sidewalk where Mettetal was stopped and arrested is open to the public. Indeed, as one of the officers who arrested Mettetal confirmed,"[t]he whole campus is open to the public." Moreover, pedestrians were not barred from the parking garage where Mettetal was first spotted. A few feet from the vehicular entrance to the garage, which was limited to automobiles, there was another garage entrance, marked by a large blue sign with white lettering that said, "Pedestrian Entrance."

We recognize, as did the district court, that Mettetal looked suspicious with his wig and fake beard, that he gave the police few answers, and that the police suspected that he had given them a fake identification. These facts and circumstances, however, did not warrant the police to conclude that there was reasonable ground to believe Mettetal had committed criminal trespass. He simply had not been notified to stay off Vanderbilt property, which by all appearances was open to the public. Accordingly, there was no probable cause to arrest him for trespass.[5]

_____

[5] The Tennessee trial court also determined that probable cause was lacking for criminal trespass. Although we are not bound by the Tennessee court's determination, see United States v. Ricks, 882 F.2d 885, 889-90 (4th Cir. 1989), we note its conclusion and reasoning:

> The Court finds no probable cause to arrest for criminal trespass. The Vanderbilt University campus is open to the public. A person would have no knowledge that he did not have Vanderbilt's consent to enter unless he was told to leave. The facts in this case show that incongruously the defendant was never told to leave but was detained. None of the conditions of exclusion set forth in the statute are applicable. The only expression of any limitation on the campus is the sign that says, "visitors are subject to a security check." This is not notice of exclusion. If a visitor was stopped and a security officer had some question about the per-

B.

The district court also concluded that the Vanderbilt police could have arrested Mettetal for the crime of stalking. This conclusion was based on Mettetal's comment to the police that he was "watching" a girlfriend whom he thought was seeing someone else. A person commits the crime of stalking in Tennessee when he"intentionally and repeatedly follows or harasses another person in such a manner as would cause that person to be in reasonable fear of being assaulted, suffering bodily injury or death." Tenn. Code Ann. § 39-17-315(a)(1) (1997). The "follow[ing] or harass[ment]" must occur on "two (2) or more separate occasions" before it gives rise to a crime. Id. § 39-17-315(a)(2)(C).**6**

_____

son's business on the campus, the security officer could then ask the individual to leave. Only then, if the person failed to leave, would there be a violation of the criminal trespass statute.

Tennessee v. Mettetal, No. 95-D-2507, mem. and order at 8-9 (5th Cir., Davidson County, Tenn. Oct. 8, 1999).

**6** The Tennessee stalking statute provides:

> 39-17-315. Stalking.--(a)(1) a person commits the offense of stalking who intentionally and repeatedly follows or harasses another person in such a manner as would cause that person to be in reasonable fear of being assaulted, suffering bodily injury or death.
>
> (2) As used in this subsection:
>
> (A) "Follows" means maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of an assault, bodily injury or death;
>
> (B) "Harasses" means a course of conduct directed at a specific person which would cause a reasonable person to fear an assault, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact; and
>
> (C) "Repeatedly" means two (2) or more separate occasions.
>
> . . . .

10

The police lacked probable cause to arrest Mettetal for stalking for either of two reasons. First, there was no information that he had followed or harassed any unfaithful girlfriend on two or more occasions. Second, the statute requires that the following or harassment be carried out "in such a manner as would cause [the victim]" to be placed in reasonable fear of harm. Here, Mettetal simply told the police that he was "watching" a girlfriend. He was not acting in a threatening manner, either in the garage or on the street. His demeanor should not have caused anyone to be in reasonable fear of assault, bodily harm, or death at his hands. The police did not have probable cause to arrest Mettetal for stalking.

C.

The district court finally concluded that the police could have arrested Mettetal for violating Tennessee's civil rights intimidation (or mask) statute. That statute is violated when a person intimidates a victim "from exercising civil rights," specifically, through injury, threat to injure, or coercion in an effort to discourage or prevent the victim from exercising or enjoying rights guaranteed by either Tennessee or federal law. See Tenn. Code Ann.§ 39-17-309(a), (b)(1)-(2) (1997). It is a separate offense "to wear a mask or disguise" while engaging in civil rights intimidation. Id.§ 39-17-309(c).[7]

_____

[7] The Tennessee civil rights intimidation statute provides:

> § 39-17-309. Civil rights intimidation.--(a) The general assembly finds and declares that it is the right of every person regardless of race, color, ancestry, religion or national origin, to be secure and protected from fear, intimidation, harassment and bodily injury caused by the activities of groups and individuals. It is not the intent of this section to interfere with the exercise of rights protected by the constitution of the United States. The general assembly recognizes the constitutional right of every citizen to harbor and express beliefs on any subject whatsoever and to associate with others who share similar beliefs. The general assembly further finds that the advocacy of unlawful acts by groups or individuals against other persons or groups for the purpose of inciting and provoking damage to property and bodily injury or death to persons is not constitutionally protected, poses a threat to public order and safety, and should be subject to criminal sanctions.

11

Mettetal was in a disguise of sorts because he was wearing an Afro wig and a false beard and moustache. Still, there was no suggestion that he was targeting any civil right or attempting to inhibit or intimidate -- by injury, threat of injury, or coercion-- anyone from exercising his or her civil rights. In short, there were no facts or circumstances to indicate that Mettetal was engaged in civil rights intimidation. There was no probable cause to arrest him for that crime.[8]

## III.

We conclude as a matter of law that the police did not have probable cause to arrest Mettetal. The evidence used to convict Mettetal in district court -- that is, the ricin found in the storage unit and the false identification documents and other evidence found in his home (or in the storage unit) -- was discovered as a result of information obtained

_____

(b) A person commits the offense of intimidating others from exercising civil rights who:

(1) Injures or threatens to injure or coerces another person with the intent to unlawfully intimidate another from the free exercise or enjoyment of any right or privilege secured by the constitution or laws of the state of Tennessee;

(2) Injures or threatens to injure or coerces another person with the intent to unlawfully intimidate another because that other exercised any right or privilege secured by the constitution or laws of the United States or the constitution or laws of the state of Tennessee;

. . . .

(c) It is an offense for a person to wear a mask or disguise with the intent to violate subsection (b);

. . . .

[8] The Tennessee trial court summarily brushed aside the state's suggestion that Mettetal could have been arrested under either the stalking or mask statute: "Neither the explanation of the defendant that he was spying on his girlfriend nor the fact that he was wearing a false beard and wig come close to a violation of either one of those statutes." Tennessee v. Mettetal, No. 95-D-2507, mem. and order at 9 (5th Cir., Davidson County, Tenn. Oct. 8, 1999).

12

from his unlawful arrest and the search incident to that arrest. This evidence should have been excluded as the fruit of the unlawful arrest. See United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998). Mettetal's convictions are therefore vacated. **9**

VACATED
_____
**9** This disposition makes it unnecessary for us to consider Mettetal's other arguments.

13